344 So.2d 1125 (1977)
James Henry WILLIAMS, Plaintiff-Appellee,
v.
RING AROUND PRODUCTS, INC., Defendant-Appellant.
No. 5883.
Court of Appeal of Louisiana, Third Circuit.
April 13, 1977.
*1126 Whitehead & McCoy by Charles R. Whitehead, Jr., Natchitoches, for defendant-appellant.
John G. Williams, Natchitoches, for plaintiff-appellee.
Before DOMENGEAUX, GUIDRY and ROGERS, JJ.
GUIDRY, Judge.
James Henry Williams, a Natchitoches Parish farmer, instituted this suit against Ring Around Products, Inc. (hereinafter referred to as Ring Around) to recover planting costs, loss of profits, and attorneys fees as a result of his planting alleged defective cotton seed processed by the defendant. Ring Around, an Alabama corporation, doing business in Louisiana, sells various types of agricultural seeds. After trial on the merits the trial judge rendered judgment in favor of plaintiff, awarding planting expenses of $2,249.16 and attorney fees of $1500.00.[1] Defendant Ring Around appeals.
The record reflects that on April 7, 1975 plaintiff through his farm manager and agent, Ralph C. Ingram, Jr., purchased eighty 50 lb. sacks of Delta Pine Land 45-A acid delinted cotton seed. The seed was purchased from Valley Farmer's Co-op of Natchitoches. Jarred Dixon, manager of Valley Farmer's Co-op, stated that he authorized shipment of the cotton seed direct to plaintiff from its vendor, Southern Farmers' Association of Little Rock, Arkansas. The Southern Farmers' Association had received the cotton seed directly from Ring Around, although a wholesale distributor, Moss Seed Company of Little Rock actually sold the seed to the Southern Farmers' Association. Ring Around was the processor of the particular cotton seed lot which was sold to the plaintiff.
Before further discussion of the facts in the instant matter we here note that the sale and shipment of seed is regulated under the Federal Seed Act Section 1-420, 7 U.S.C.A. Sections 1551-1610 and LSA-R.S. 3:1431-3:1448. To summarize the Louisiana provisions it is provided that each container of agricultural seed sold in Louisiana for planting purposes shall bear a conspicuous label which plainly sets forth the name and variety of the seeds sold; the place where grown; the lot identification number; the percentage by weight of inert matter; and the percentage of germination. The Louisiana Seed Commission is authorized to administer these rules and regulations as well as prescribe rules pertaining to the methods of sampling, inspecting, and making analysis tests and examinations of all seeds.
The tag or label which was attached to the seed purchased by the plaintiff complied with the requirements above referred to. In particular the tag showed that the cotton seed, Delta Pine Land 45-A, lot number 59087501 had been tested on March 25, 1975 by Ring Around and found to have 70% germination. The cotton seed was grown and inspected in Mississippi.
Plaintiff after receipt of the particular seed on April 7, 1975, stored the same in the *1127 center section of a large metal building located on his farm. This building which had a concrete floor, also stored agricultural chemicals and plaintiff's primary variety of cotton seed, Delta Pine Land16. Ralph Ingram testified that he had stored seed in this building before and had never experienced any problems with seed deterioration. Plaintiff corroborated this testimony.
Both plaintiff and Ingram testified that in May of 1975 the weather conditions were ideal for planting cotton. The weather was warm with rain showers 3-4 days a week. Plaintiff began planting the DPL-45-A on May 12, 1975. The seed was planted on three separate tracts amounting to 165 acres. The 55 acre Kaffie tract was planted first, the 20 acre Old River tract was planted on May 15, 1975 and the 90 acre I Hope tract was planted on May 21, 1975. The remainder of plaintiff's 2300 acre farm had been planted earlier with DPL-16 seed.
Ingram testified that shortly after the planting of the DPL-45-A seed it became apparent he was going to have germination problems. This was later confirmed when the DPL-16 planted on adjacent tracts to the DPL-45-A produced a beautiful stand of cotton whereas the DPL-45-A produced no stand at all. As a result of this situation plaintiff contacted Jarred Dixon of the Valley Farmer's Co-op who came out to plaintiff's farm to view the cotton. Dixon likewise found no stand on the DPL-45-A, although the cotton alongside, the DPL-16 had a perfect stand. Dixon received one other complaint about the DPL-45-A in Natchitoches Parish, but he could not remember if the seed was from the same lot number.
Plaintiff returned to the Farmer's Co-op 38 sacks of DPL-45-A he had remaining and was given full credit on the entire purchase price. Plaintiff, thereafter replanted the 165 acres with one year old DPL-45-A cotton seed. Plaintiff estimated that the cost of the replanting was $2,249.16.
As a consequence of the germination problems plaintiff was experiencing the chief inspector for the Louisiana Department of Agriculture, Robert Willett, was called in to take a seed sample of the DPL-45-A. Willett, on May 14, 1975 took a sampling of the DPL-45-A at plaintiff's farm. Subsequently, this sample was sent to the State's seed analyst, Delmar Johnson. Plaintiff's samples were received and logged by Johnson on May 19, 1975 and the test was completed on June 2, 1975. The analysis showed that the sample seed from plaintiff had a 25% germination rate. As aforestated, Ring Around certified this same seed to have a 70% germination rate. We observe at this point that the evidence clearly indicates that a 70% germination is low quality seed and that usually certification of seed by state agencies requires 80% germination. However, in this particular year cotton seed was scarce and the minimum requirements for certification were relaxed to 70%. Any seed below 70% germination could not be certified.
The defendant introduced as a witness Paul Johnson, a registered seed analyst for Ring Around Products. Paul Johnson testified that on March 17, 1975 following their receipt of the unprocessed cotton seed from Mississippi he performed a live seed test on lot number 59087501. The seed was in a raw state. The results of that examination showed a 49% germination. Thereafter the seed lot was processed, whereby all the immature seeds, mash seeds and oblong and odd seeds were cleaned from the lot. The processing of cotton seed takes out all the lighter seeds which tend to be dead or of low germination rate. After completion of the processing another test was performed by Johnson and this time the seed showed a germination of 70% and the lot was certified accordingly. Ring Around also sent samples of this particular lot to an independant seed analyst, Hulsey Seed Laboratory in Atlanta, Georgia. C. J. Hulsey, a registered seed technologist, performed seed tests of this sample on April 2, 1975 and April 11, 1975, which resulted in a showing of 71% germination and 77% germination, respectively. A retest performed by Hulsey on June 28, 1975 showed a germination of 70%. Hulsey performed these tests on the *1128 same sample of seed which had been furnished by Ring Around. Hulsey stated, however, that it was possible there was a lack of uniformity in the particular seed lot involved. Hulsey testified that cotton seed should usually hold up for nine months, except that during the summer months, when the temperature and humidity is high, the seed will deteriorate more rapidly.
Defendant contends that the trial court committed error in concluding that the cotton seed processed by Ring Around was defective at the time of plaintiff's purchase. Defendant alternatively contends that even if the seed was defective its liability to plaintiff is limited to a return of the purchase price pursuant to the limitation of warranty under which the seed was sold.
Our review of the evidence convinces us that, despite the results of the tests made by defendant, there was a reasonable basis for the trial court's finding that the cotton seed DPL-45-A which defendant processed, and which plaintiff purchased, was defective.
The remaining issue concerns whether plaintiff purchased the DPL-45-A seed under a limited warranty and if so whether the alleged limitation of warranty agreement restricts plaintiff's recovery to a return of the purchase price.
In all sales in Louisiana there is an implied warranty that the object sold is fit for the purpose intended which warranty can be avoided only by express and explicit waiver. LSA-C.C. arts. 2520, 2541 and 2542; A. A. Gilbert Pipe & Supply Company v. Cassard, 240 La. 180, 121 So.2d 736 (1960); California Chemical Company v. Lovett, 204 So.2d 633 (La.App.3rd Cir. 1967).
The alleged limitation of warranty agreement involved herein reads as follows:
"The seller warrants to the extent of the purchase price that seeds or bulbs are sold as described on the label or container, within recognized tolerances. Seller gives no other or further warranty, express or implied. No liability hereunder shall be assessed unless the buyer or user reports to the warrantor within a reasonable period after discovery (not to exceed 30 days) any condition that might lead to a complaint." (Emphasis ours)
Defendant alleged that the quoted limitation of warranty was either printed on or attached to each sack of seed sold to plaintiff.
The trial court found the seed plaintiff purchased defective and awarded plaintiff damages for the cost of replanting and attorney fees. In his reasons for judgment the trial judge made no finding or reference whatever to a limited warranty agreement between the parties. Presumably, the trial court in awarding the damages prayed for by plaintiff, either found that there was no limitation of warranty agreement applicable to the sale or that the alleged waiver of warranty was ineffective. In this latter connection see the recent case of Hendricks v. Horseless Carriage, Inc. et al., 332 So.2d 892 (La.App.2nd Cir. 1976) and authorities therein cited.
We conclude that in the instant case the evidence falls short of establishing by a reasonable preponderance of the evidence that the warranty agreement was affixed to the sacks of seed sold to plaintiff.
For this reason we deem it unnecessary to determine whether the alleged waiver of warranty was ineffective. Specifically, we do not consider it necessary to determine whether the elements set forth in the cited case must be present in order to give effect to a waiver of warranty agreement regardless of the atypical nature of the product sold.
Plaintiff unequivocally testified that there was no limitation of warranty agreement on the sacks of seed which he purchased. There was no mention whatever of a limitation of warranty on the sales receipt delivered to him at the time of sale by the Valley Farmers Co-op. The sacks which contained the seed were not available at the time of trial. Plaintiff's farm manager, Ralph Ingram, testified that he did not see a limitation of warranty agreement on any of the sacks of seed which were planted. Countering this is the testimony of Mr. Dru *1129 Smith, the production and processing manager of Ring Around, to the effect that the quoted limitation of warranty is customarily used throughout the seed industry and that such an agreement or notice is put on every bag of seed processed by defendant. All of the other persons who had any direct contact with the specific sacks of seed in question were unable to state whether the agreement or notice was affixed thereon. Considering the above we conclude that the defendant has failed to establish by a reasonable preponderance of the evidence that the limitation of warranty agreement above quoted was applicable to the instant sale.
For the above and foregoing reasons the judgment appealed from is affirmed. All costs of these proceedings on appeal are to be borne by the appellant.
AFFIRMED.
NOTES
[1] At the trial of this matter plaintiff abandoned his claim for lost profits.