DELHOMME INDUSTRIES, INC., Plaintiff-Appellee Cross-Appellant,

v.

HOUSTON BEECHCRAFT, INC. and Beech Aircraft Corporation, Defendants-Appellants Cross-Appellees.

No. 80–3335.

United States Court of Appeals, Fifth Circuit.

March 11, 1982.

Howard Daigle, Jr., New Orleans, La., for defendants-appellants cross-appellees.

Ross A. Brupbacher, Lafayette, La., for plaintiff-appellee cross-appellant.

Before GEE and RUBIN, Circuit Judges, and SPEARS *, District Judge.

* District Judge of the Western District of Texas,

ALVIN B. RUBIN, Circuit Judge:

After a corporation bought an airplane pursuant to two separate written agreements, it claimed that the airplane was defective. The buyer sold the airplane back to the seller for considerably less than its original price, then sued the seller and the manufacturer of the airplane for damages, invoking the diversity jurisdiction of a federal district court in Louisiana. The resolution of this litigation depends on whether we apply the law of Louisiana, where the two agreements were executed and where the buyer received and used the airplane and later filed suit, or the law of Kansas, which was elected in one of the two agreements. There is, and can be, no dispute that, because our jurisdiction is based on diversity, we must apply Louisiana's rules in making this critical decision. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Long Island Trust Co. v. Dicker*, 659 F.2d 641, 648 (5th Cir. 1981); *Vicon, Inc. v. CMI Corp.*, 657 F.2d 768, 772 (5th Cir. 1981).

Construing the two agreements together, we conclude that in this case Louisiana courts would apply Kansas law and require the seller to perform express contractual warranties, but not the Louisiana implied warranty against redhibitory, or hidden, defects, or any warranties implied under Kansas law. We, therefore, reverse the judgment in favor of the buyer based on the Louisiana implied warranty, and remand for further proceedings to determine whether the buyer has a cause of action under Kansas law, which is, in this litigation, surrogate Louisiana law.

### I

As found by the district court, with ample support in the record, Fed.R.Civ.P. 52(a), these are the facts. Delhomme Industries, Inc. ("DI"), a Louisiana corporation, sells and rents large generators and related equipment to companies that explore for and produce oil and gas. Richard

sitting by designation.

Delhomme is its principal stockholder and chief executive officer. He was a pilot and either he or the corporation has owned a number of airplanes.

In March 1977, DI owned a twin-engine Cessna 340 A/II. Delhomme decided that DI should buy a larger and faster airplane. After surveying the market, Delhomme decided on a Beech B–100 King Air and entered into negotiations with Houston Beechcraft, Inc. ("HB"), a corporation domiciled in Houston, Texas. HB sells and services airplanes manufactured by Beech Aircraft Corporation, a corporation domiciled in Wichita, Kansas.

Delhomme agreed to buy a Beech B–100 King Air from HB. The airplane had been used as a demonstrator, but was to be sold under the same warranty as if it were new. The airplane, however, was in Denver, Colorado, and Delhomme had not inspected it. On March 30, 1977, Delhomme and a representative of HB signed an agreement for the purchase of the airplane. In the blanks provided on the printed form that they used, they stated that the price of the airplane was $842,000, which was to be paid in part by DI's transfer of its Cessna, valued at $170,000, to HB. The agreement stated that DI had paid $50,000 in cash and was to pay the balance of $622,000 in cash upon delivery of the airplane. The agreement listed seven "Contingencies of Sale," [1] including provisions that the airplane was "to be delivered to Purchaser free of squawks," and that the sale was "[s]ubject to Purchaser obtaining suitable financing." Delhomme was to be flown to Denver to inspect the airplane. If he did not then accept it, the $50,000 deposit would be refunded, but he would be charged $1,700 for the trip to Denver.

In April 1977, Delhomme and DI's chief pilot, Leo Carlin, went to Denver where, after inspecting the airplane, they accepted it. Dave Yount, a Beech Aircraft Corporation pilot, then flew the airplane to Houston with Delhomme and Carlin aboard. The three then flew to DI's home office in New Iberia, Louisiana, where Yount instructed Delhomme and Carlin how to use the airplane. Apparently in New Iberia (although an attestation was executed in Houston), Delhomme signed a second agreement, dated April 6, on behalf of DI. This agreement provided the "suitable financing" on which the first agreement had been conditioned.

After the airplane was delivered, DI reported a number of problems which the district court set forth in detail in its opinion. The district court found that none of these problems resulted from DI's failure to operate the airplane in accordance with the manufacturer's instructions.

DI operated the airplane for seven months, during which it paid monthly financing installments greater than $12,000 per month. In October, DI grounded the airplane because of the claimed defects. Delhomme wrote to HB seeking to get it to make the necessary repairs. HB responded in November, when it flew the airplane to Houston for repairs. It removed the left engine and discovered heat damage, which it contended resulted from improper starting of the airplane. HB demanded that DI pay the cost of the engine repair work, estimated to be between $10,000 and $12,000, before HB did any other repair work. The district judge found, however, that the engine damage was attributable to faulty instruments and was chargeable to HB, not DI.

1. These contingencies were typed and handwritten on the front of the purchase order. They are as follows:
 1. Subject to Purchaser obtaining suitable financing.
 2. Aircraft to be delivered to Purchaser free of squawks.
 3. Aircraft to be delivered in Louisiana (no sales tax collected).
 4. Price includes school for two pilots at Beech Factory.
 5. Subject to Purchaser inspecting aircraft. If Purchaser does not accept aircraft, a charge of $1700.00 will be made for trip to Denver, however $50,000 will be refunded.
 6. Aircraft to be delivered with fresh 100 hour.
 7. Special "N" number to be installed by Seller.

Three weeks after the dispute about the engine repairs, DI sold the airplane to HB for $625,000. HB paid $6,000 in cash and canceled the amount due on the purchase agreement. The parties executed no writing concerning the effect of this transaction, and the district judge found as a fact that the parties did not intend it to be a compromise. Later, after repairing the airplane, HB sold it to a third party for $662,500.

## II

The March 30 agreement is on a printed form apparently prepared by Beech Aircraft Corporation. Although it is captioned "Airplane Purchase Order," it provides: "This purchase order when accepted by Seller becomes a binding contract of purchase and sale . . . . [T]his purchase order, when accepted by Seller, is the only contract controlling this sale and purchase, and . . . contains all agreements, express or implied, either verbal or in writing . . . ." It sets forth a manufacturer's limited warranty together with a manufacturer's limited remedy of repair or replacement of defective parts [2] for breach of warranties. Another provision, printed in uppercase type, states: "To the extent allowed by applicable law, the obligations of manufacturer [Beech Aircraft] set forth herein shall be the exclusive remedies for any breach of warranty hereunder, and, to the same extent neither manufacturer nor seller shall be liable for any general, consequential or incidental damages . . . ." As we have already noted, note 1 supra, a sentence is typed on the front of the form that appears to be an express warranty—"Aircraft to be delivered to Purchaser free of squawks."

The April 6 agreement, which according to HB supersedes the March 30 agreement, is on a printed, legal-sized form captioned with the words "Beech Acceptance Corporation, Inc." Near the top of the form, immediately below those words, is a line with the words "Retail Installment Contract," and immediately below that line are the words "Conditional Sales Contract and Security Agreement." About two inches below these words is this statement: "Secured Party [HB] hereby sells the aircraft described [below] to Debtor [DI]." On the back of the form, about three inches from the top, in uppercase, boldface type, is the following statement: "There are no express warranties unless they appear in writing signed by the seller and there are no implied warranties of merchantability or fitness for a particular purpose made in connection with the sale of the collateral." [3] About one inch below this statement, under the heading "Additional Agreements and Affirmations," is the choice of law provision: "The law governing this secured transaction shall be that of the State of Kansas in force at the date of this Security Agreement." Below this, near the middle of the form, is the following statement in uppercase type: "Notice to the Buyer: Do not sign this contract before you read it . . . ."

The district court found that the warranties in the March 30 agreement were "in writing and signed by the seller" and that "the parties intended these representations to survive the execution of the April 6 contract." It found that "squawk-free" meant that HB was required to provide DI with "a like-new aircraft . . . free of defects which could be operated trouble-free during the early life of the airplane." [4] The

---

**2.** The manufacturer's limited remedy provides: "[T]he entire extent of Manufacturer's liability hereunder shall be limited to that of either repairing the defective part or providing a new replacement part, free of charge to the Buyer, in which event the part to be repaired or replaced shall be returned prepaid to the Manufacturer."

**3.** The "collateral" is described on the front of the form as a "Beech Aircraft Corp. B–100 King Air." Other identifying information accompanies this description.

**4.** The district court noted that "[t]here was considerable testimony as to the meaning which should be attached to that term." The word "squawk" was coined by Lewis Carroll as a combination of "squall" and "squeak." W. Morris & M. Morris, Morris Dictionary of Word and Phrase Origins 541 (1976). One book defines "squawks" as "malfunctions of the airplane that need to be reported to the maintenance crew after landing." P. Eddy, E. Potter

district court then held that the sale was "a Louisiana sale," and, applying Louisiana law, concluded that Delhomme did not waive the implied warranty against redhibitory vices and defects under La.Civ.Code Ann. arts. 2474–2475, 2520–2548 (West 1952 & Cum.Supp.1981).[5] The district court made no finding concerning the applicability of the choice of law provision in the April 6 agreement.

Applying Louisiana law, the district court also found that the airplane had hidden defects, that the buyer's claim was to be treated as one in quanti minoris (reduction of the price) rather than rescission, and calculated DI's damages as the difference between the initial purchase price, $842,000, and the price paid on the sale of the airplane back to HB, $625,000, amounting to a net of $217,000. It also allowed DI to recover attorney's fees, and offset the value of DI's use of the airplane against the amount DI paid on the installment note, insurance, and other costs of operation.

### III

Before trial, both DI and HB moved for partial summary judgment to determine which state's substantive law governed the sale. HB argued that Kansas law governed the sale, that DI thus had no cause of action under Louisiana law, and that DI's claim under Louisiana law should, therefore, be dismissed. DI, however, argued that Louisiana law governed the sale.

The district court denied HB's motion to dismiss DI's claim.[6] Later, in the opinion it rendered after the trial, the district court held that "[r]egardless of whether the March 30 or April 6 contract transmitted title of the B–100 aircraft from Houston Beechcraft to Delhomme, this sale is a Louisiana sale to the extent of determining what warranties were implied with the sale."

HB argues that this holding is wrong because the April 6 agreement, which HB contends is the contract governing the sale, contains a choice of law clause that requires Kansas law to be applied. DI argues, in opposition, that the March 30 agreement governs the sale, and that the choice of law provision in the April 6 agreement is, therefore, irrelevant. DI also argues that, even if the April 6 agreement were the contract governing the sale, "Louisiana public policy [would] prohibit the application of Kansas law" pursuant to that agreement's choice of law clause. Thus, according to DI, because both agreements were executed in Louisiana, and the trial court correctly held that neither agreement is governed by the choice of law provision, Louisiana law must apply to the sale.

### IV

We turn now to the first two questions: (1) Which agreement governs the sale of the airplane? (2) If the April 6 agreement governs the sale, in whole or in part, is its choice of law provision valid?

& B. Page, Destination Disaster 209 (1976); *accord,* Webster's Third New International Dictionary, s.v. "squawk sheet" (1966).

5. These articles contain Louisiana's warranty law. They "impose upon a seller the warranty that its goods are reasonably fit for the purposes intended by both parties to the sale." *Jones v. Menard,* 559 F.2d 1282, 1284 (5th Cir. 1977). Article 2520 defines "redhibition" as "the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." "A warranty against redhibitory vices is implied in every contract of sale, unless expressly excluded."

*Perkins v. Chatry,* 58 So.2d 349, 352 (La.App. 1952); *accord, e.g., Nelson v. M.C.M. Truck Lines,* 209 La. 582, 586, 25 So.2d 236, 237 (1946); *Williams v. Ring Around Prods., Inc.,* 344 So.2d 1125, 1128 (La.App.1977). *See generally* S. Litvinoff, Smith's Materials on the Louisiana Law of Sales and Leases 354–407 (1978); Comment, *The Nature of the Redhibitory Action,* 4 Tul.L.Rev. 433 (1930).

6. The court's ruling on HB's motion reads as follows: "The motion of defendants, Beech Aircraft Corporation and Houston Beechcraft, Inc., is denied. A question of fact is presented as to whether there was a knowledgeable waiver of the warranties by the plaintiff in connection with the sale of the aircraft."

**1056**

■ Two corporations, each represented by experienced businessmen, signed two separate agreements. There is no evidence that they intended either to be read in isolation. There is no evidence that the first was to stand alone. And as the trial court found, there is no evidence that the second was to supersede the first,[7] which contained carefully negotiated terms[8] typed and written on a printed form.[9] The first was subject to conditions, one of which, adequate financing, was supplied by the second. See *Admiral Paint Co. v. Goltzman*, 254 So.2d 104, 106 (La.App.1971) (second agreement "entered into in furtherance of" first agreement), *writ denied*, 260 La. 289, 255 So.2d 772 (1972). These agreements should, as the district court stated in its findings of fact, be read together.

> [I]t is well-settled law that several writings executed between the same parties substantially at the same time and relating to the same subject-matter may be read together as forming parts of one transaction, nor is it necessary that the instruments should in terms refer to each other if in point of fact they are parts of a single transaction.

*Bailey v. Railroad Co.*, 84 U.S. (17 Wall.) 96, 108, 21 L.Ed. 611, 613 (1873).[10] The two documents, therefore, constitute but one contract that stipulates the terms of the sale of the airplane.

## V

The contract thus confected contains the express "squawk-free" warranty, the express manufacturer's limited warranty, a waiver of all other warranties, the manufacturer's limited remedy of repair or replacement for breach of warranties, and a provision that the sale be governed by Kansas law. We must now determine whether the choice of law provision should be given effect. This issue comprises two distinct questions:[11] (1) Would a Louisiana court permit contracting parties to choose the body of law to be applied in interpreting and enforcing their contract? and (2) Would a Louisiana court recognize this particular choice of law provision, and apply Kansas law? We conclude that the answer to both of these questions is "Yes."

1. HB contends that Louisiana courts recognize and honor contractual choice of law provisions. In support, it relies primarily on the argument that Louisiana has adopted the Restatement (Second) of Conflict of Laws (1969),[12] which permits parties

---

7. *Cf. West India Indus. v. Tradex*, 664 F.2d 946, 949 (5th Cir. 1981) (second of two agreements contained superseding clause); *CMS Indus. v. L.P.S. Int'l, Ltd.*, 643 F.2d 289, 294 (5th Cir. 1981) ("When the two agreements are read together, it is evident that an attempt was made to undo in one precisely that which was done in the other. Hence, we cannot, as the long-standing rule of construction enjoins, so read them as to preserve both."); *S–C Indus. v. American Hydroponics Sys., Inc.*, 468 F.2d 852, 854 n.2 (5th Cir. 1972) (per curiam) (contract of sale contained express warranty that said it "supersede[d] all other warranties ... expressed or implied").

8. *See* note 25 and accompanying text *infra*.

9. In its brief, DI agrees with the trial court's finding, and says that "the April 6th document did not by its terms revoke or supercede [*sic*] the March 30th sale agreement." HB's brief does not discuss this point.

10. *Accord, Mississippi River Grain Elevator, Inc. v. Bartlett & Co., Grain*, 659 F.2d 1314, 1317–18 (5th Cir. 1981); *Finkel v. Texas-Edwards, Inc.*, 295 So.2d 903, 906–07 (La.App.),

*writ denied*, 299 So.2d 798 (La.1974); *Admiral Paint Co. v. Goltzman*, 254 So.2d at 105–06; *Hirsh v. Miller*, 167 So.2d 539, 541, 543 (La.App.1963), *writ denied*, 246 La. 909, 168 So.2d 821 (1965); *see Schloss Bros. v. Charles Stern Co.*, 36 F.2d 628, 631 (5th Cir. 1929); La.Civ.Code Ann. art. 1949 (West 1977) ("When there is anything doubtful in one contract, it may be explained by referring to other contracts or agreements made on the same subject between the same parties, before or after the agreement in question.").

11. *See Wilkinson v. Manpower, Inc.*, 531 F.2d 712, 715 (5th Cir. 1976).

12. HB also relies on *Fine v. Property Damage Appraisers, Inc.*, 393 F.Supp. 1304 (E.D.La. 1975), and on *Fine's* interpretation of La.Civ. Code Ann. art. 11 (West 1952), which provides, in pertinent part, that "[i]ndividuals ... can renounce what the law has established in their favor." *Fine* itself, however, relied partly on the Restatement (Second) in interpreting article 11, and in determining how Louisiana's conflict of law rules would treat a contractual choice of law provision. 393 F.Supp. at 1308.

to stipulate in their contract the law that is to govern it.[13] HB argues, therefore, that a Louisiana court would, as an initial matter, consider applying the choice of law provision in the April 6 agreement.

Although DI never addresses this point directly, it apparently contends that, in this case, a Louisiana court would not follow the rules prescribed by the Restatement (Second), but instead would apply the traditional rule of lex loci contractus. Under this rule, "the effect attributed to a contract and the rights, duties and obligations of the parties arising thereunder and flowing therefrom are, as a general rule, to be determined by the laws of the state in which the contract is executed." *Delta Equip. & Constr. Co. v. Cook*, 142 So.2d 427, 430 (La.App.1962).[14] DI therefore urges us to conclude that, because both the March 30 and the April 6 agreements were executed in Louisiana, Louisiana law, and not Kansas law, governs the sale of the airplane.

■ In the absence of a choice of applicable law by the parties, some recent Louisiana cases, as well as federal cases applying Louisiana law, have followed the Restate-

ment (Second),[15] although others have followed the traditional rule of lex loci contractus.[16] Louisiana courts, however, permit parties to stipulate in their contract which state's law will govern the contract, in accordance with the principles set forth in § 187(1) of the Restatement (Second). *See Porter v. American Optical Corp.*, 641 F.2d 1128, 1144 (5th Cir.) ("contrary intent by the parties"), *cert. denied*, —— U.S. ——, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Southern Ins. Co. v. Consumer Ins. Agency, Inc.*, 442 F.Supp. 30, 31 (E.D.La.1977).[17]

2. This conclusion leads us to the question whether, on the facts of this case, a Louisiana court would honor the choice of law provision and apply Kansas Law. *See Baton Rouge Bldg. Trades Council v. T. L. James & Co.*, 201 La. 749, 794, 10 So.2d 606, 621 (1942).

The choice of law provision in effect waives DI's redhibitory rights: it substitutes Kansas law for Louisiana law, and redhibitory rights are available only under Louisiana law. DI argues that "Louisiana public policy [would] prohibit the applica-

**13.** Section 186 of the Restatement (Second) provides: "Issues in contract are to be determined by the parties in accordance with the rule of § 187 ...." Section 187(1) of the Restatement (Second) provides: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by explicit provision in their agreement directed to that issue."

**14.** *See generally* R. Leflar, American Conflicts Law § 145 (3d ed. 1977); R. Weintraub, Commentary on the Conflict of Laws § 7.3A (2d ed. 1980).

**15.** *Lee v. Hunt*, 631 F.2d 1171, 1176 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981); *Brinkley & West, Inc. v. Foremost Ins. Co.*, 499 F.2d 928, 932 & n.3 (5th Cir. 1974); *Brawner v. Kaufman*, 496 F.Supp. 961, 962 (E.D.La.1980); *Wickham v. Prudential Ins. Co. of Am.*, 366 So.2d 951, 954 (La.App.1978); *Sutton v. Langley*, 330 So.2d 321, 326–28 (La.App.), *writs denied*, 332 So.2d 805, 820, 333 So.2d 242 (La.1976); *see Fenasci v. Travelers Ins. Co.*, 642 F.2d 986, 992 (5th Cir. 1981); *Highlands Ins. Co. v. Employers' Surplus Lines Ins. Co.*, 497 F.Supp. 169, 171 (E.D. La.1980); *In re Succession of Dunham*, 393

So.2d 438, 444–45 (La.App.1980), *writ granted*, 397 So.2d 802 (La.1981).

**16.** *Porter v. American Optical Corp.*, 641 F.2d 1128, 1144 (5th Cir.) ("Louisiana follows the general rule that the nature, validity and construction of a contract [are] to be determined by the law of the place where it was made."), *cert. denied*, —— U.S. ——, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Wickham v. Prudential Ins. Co. of Am.*, 366 So.2d at 954–55 (Edwards, J., dissenting); *Stark v. Marsh*, 314 So.2d 465, 467 (La.App.1975); *see Sprow v. Hartford Ins. Co.*, 594 F.2d 418, 421 (5th Cir. 1979).

**17.** *Accord, Lee v. Hunt*, 631 F.2d at 1176 n.6; *Palmer v. Chamberlin*, 191 F.2d 532, 536 (5th Cir. 1951); *Publicker Distillers Prods., Inc. v. Pelican State Distribs.*, 501 F.Supp. 304, 306 (E.D.La.1980); *Fine v. Property Damage Appraisers, Inc.*, 393 F.Supp. at 1308; *Associated Press v. Toledo Invs., Inc.*, 389 So.2d 752, 754 (La.App.1980); *ADR v. Graves*, 374 So.2d 699, 700 (La.App.), *writ denied*, 377 So.2d 843 (La. 1979); *United States Leasing Corp. v. Keiler*, 290 So.2d 427, 430 (La.App.1974); *Davis v. Humble Oil & Ref. Co.*, 283 So.2d 783, 788 (La.App.1973); *see Pritchard v. Norton*, 106 U.S. 124, 129, 1 S.Ct. 102, 105, 27 L.Ed. 104, 105 (1882).

tion of Kansas law" because "Louisiana has clearly adopted a public policy against easy waiver" of redhibitory rights.[18] DI contends, therefore, that the choice of law provision is invalid because it violates Louisiana public policy, and that Louisiana law thus governs the sale.

▆ Before passing on the validity of the choice of law provision, we must consider several general principles. The Louisiana rule on contractual choice of law provisions is that "[w]here parties stipulate the State law governing the contract, Louisiana conflict of laws principles require that the stipulation be given effect, unless there is statutory or jurisprudential law to the contrary or strong public policy considerations justifying the refusal to honor the contract as written." *Associated Press v. Toledo Invs., Inc.*, 389 So.2d 752, 754 (La.App. 1980).[19] A choice of law provision in a contract is presumed valid until it is proved invalid. *E.g., Wilson v. Sawyer*, 106 So. 2d 831, 833 (La.App.1958) ("a legal presumption exists, in effect, in favor of the validity of contracts"). The party who seeks to prove such a provision invalid because it violates public policy bears the burden of proof. *J. Perez, S.A. v. Louisiana Rice Growers, Inc.*, 139 So.2d 247, 253 (La.App.1962) ("[W]hen one party charges that the contract is confected with an ille-

gal intent or that it is contrary to good morals or public order, the burden rests upon him to establish that allegation.").[20] Courts are reluctant to declare such provisions void as against public policy. *See Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356–57, 51 S.Ct. 476, 477, 75 L.Ed. 1112, 1116 (1931). They will do so only if there is "an express legislative or constitutional prohibition or a clear showing that the purpose of the contract contravenes good morals or public interest." *Meinerz v. Treybig*, 245 So.2d 557, 559 (La. App.), *writ denied*, 258 La. 580, 247 So.2d 395 (1971).[21] One state's law does not violate another state's public policy merely because the laws of the two states differ. Restatement (Second) of Conflict of Laws § 90 comment b (1969) ("A mere difference in the local law rules of the two states will not render the enforcement of a claim created in one state contrary to the public policy of another."). Courts favor, and tend to uphold, choice of law provisions in contracts, *see* R. Weintraub, Commentary on the Conflict of Laws § 7.3C, at 355 (2d ed. 1980), particularly when such provisions are used in interstate transactions, *Fine v. Property Damage Appraisers, Inc.*, 393 F.Supp. 1304, 1308 (E.D.La.1975); *Davis v. Humble Oil & Ref. Co.*, 283 So.2d 783, 794 (La.App.1973) (on rehearing); R. Wein-

---

**18.** DI confuses its argument on this issue by discussing the specific waiver-of-warranty provisions, rather than the choice of law provision, in the April 6 agreement. These waiver-of-warranty provisions become relevant only *after* we have passed on the validity of the choice of law provision. If the choice of law provision is valid, then the effect of the waiver-of-warranty provisions must be considered in the light of Kansas law; and if the choice of law provision is invalid, then the effect of the waiver-of-warranty provisions must presumably be considered in the light of Louisiana law.

**19.** *Accord, Fine v. Property Damage Appraisers, Inc.*, 393 F.Supp. at 1308; *ADR v. Graves*, 374 So.2d at 700–01; *United States Leasing Corp. v. Keiler*, 290 So.2d at 430; *see Mente & Co. v. Roane Sugars, Inc.*, 199 La. 686, 698, 6 So.2d 731, 734 (1942) (parties to a contract "may contract as they please, provided the cause of the contract is lawful, not contrary to public policy and not forbidden by law, moral conduct or public order"); *Roll-Up Shutters,*

*Inc. v. South Cent. Bell Tel. Co.*, 394 So.2d 796, 798 (La.App.) (same), *writ denied*, 399 So.2d 599 (La.1981); *Smith v. Globe Indem. Co.*, 243 So.2d 882, 889 (La.App.1971) ("We agree with the rule that state courts will not enforce the laws of other states that are contrary to their own or are contrary to equity or good morals.").

**20.** "The burden of showing illegality is upon the party asserting it and it is not sufficient merely to create suspicion and suggest doubts as to its legality." *United States v. Grace Evangelical Church*, 132 F.2d 460, 462 (7th Cir. 1942), *quoted in Palmer v. Chamberlin*, 191 F.2d at 539; *accord, Wilson v. Sawyer*, 106 So.2d at 832.

**21.** *Accord, Muschany v. United States*, 324 U.S. 49, 66–67, 65 S.Ct. 442, 451, 89 L.Ed. 744, 756 (1945); *Steele v. Drummond*, 275 U.S. 199, 205, 48 S.Ct. 53, 54, 72 L.Ed. 238, 240 (1927).

traub, *supra*, § 7.3C, at 357.[22] Finally, a court will be more likely to uphold the provisions of a contract made in a business transaction than the terms impressed by adhesion on an unknowledgeable consumer. *Id.* § 7.4E, at 378 ("The more commercial the context of the transaction ... the greater the need for validation and the stronger the presumption of validity."); *see id.* § 7.5.

With these principles in mind, we turn to the facts of this case. Both DI and HB are corporations, and each is engaged in extensive business enterprises. The contract was for the sale of an airplane for DI's business.[23] The airplane sale is a multistate transaction: DI is a Louisiana corporation, HB is a Texas corporation, and Beech Aircraft Corporation is a Kansas corporation. The cost of the airplane, including financing, exceeded $1 million. Richard Delhomme, who signed the contract for DI, has been the president and owner of DI since it was founded almost twenty years

ago. He also owns interests in three other companies. In his work with DI, which sells and services oilfield equipment, he has occasion to deal with equipment warranties. He testified that he bought the airplane after making "an extensive study" of DI's needs.[24] He had previously purchased six to eight airplanes. He bargained over, and was able to affect the terms of, the contract of sale.[25] That the choice of law provision is part of a printed form contract does not invalidate it,[26] especially since DI itself is suing to enforce the terms of that contract. *Davis v. Humble Oil & Ref. Co.*, 283 So.2d at 794 (on rehearing).[27]

Most important, DI has never shown that under Louisiana law, parties may not, either by acting under Louisiana law or by choosing another state's law, waive their redhibitory rights. *Cf. Associated Press v. Toledo Invs., Inc.*, 389 So.2d at 754 ("clear conflict between Louisiana statutes and New York law").[28] Nor could it in

---

**22.** Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby.
Restatement (Second) of Conflict of Laws § 187 comment e (1969).

**23.** One of DI's witnesses, moreover, testified that DI had an agreement with another company, Pelican Aviation, to lease DI's airplane to Pelican in return for revenues of about $50,000 per year. Although the district court found that DI had failed to prove that it would have derived revenues from this agreement, this testimony nevertheless reinforces the commercial character of the airplane sale.

**24.** *Cf. K&C, Inc. v. Westinghouse Elec. Corp.*, 437 Pa. 303, 308, 263 A.2d 390, 393 (1970) (finding no unconscionability in commercial purchase; plaintiffs "made a long and careful study" before making purchase).

**25.** The record shows that Delhomme insisted on and won the inclusion in the contract of the seven conditions listed in note 1 *supra*. Because these conditions are typed and written on the contract, they prevail over any conflicting clauses on the printed form contract. *Dean v. Pisciotta*, 220 La. 725, 731, 57 So.2d 591, 593 (1952); *Jones v. Gentilly Dodge, Inc.*, 397 So.2d

849, 851 (La.App.1981); *Bergeron v. Parish Lumber Home Improvements, Inc.*, 255 So.2d 163, 168 (La.App.1971). Thus Delhomme could have similarly superseded other printed provisions in the contract, including the choice of law provision, by bargaining for changes in the contract to that effect.

**26.** *Fine v. Property Damage Appraisers, Inc.*, 393 F.Supp. at 1308; *Davis v. Humble Oil & Ref. Co.*, 283 So.2d at 794 (on rehearing); *see* R. Leflar, American Conflicts Law § 147, at 302 n.5 (3d ed. 1977).

**27.** In this respect, among others, this case differs from *Associated Press v. Toledo Invs., Inc.*, *ADR v. Graves*, and *United States Leasing Corp. v. Keiler*, all discussed *supra*. In those cases, Louisiana public policy was used to protect the party who was *being sued* on a contract that contained an allegedly invalid choice of law provision.

**28.** *Accord, ADR v. Graves*, 374 So.2d at 701 (conflict between North Carolina law and La. Rev.Stat.Ann. § 23.921 (West 1964)); *United States Leasing Corp. v. Keiler*, 290 So.2d at 430–31. In *Keiler*, the contract and choice of law provision at issue conflicted with La.Rev. Stat.Ann. § 13:4106 (West 1968). Section 13:4107, the statute immediately following § 13:4106, states that § 13:4106 "declares a public policy and the provisions thereof cannot, and shall not be waived." No prohibitory statute like § 13:4107 is present in this case.

fact make such a showing, for Louisiana courts have explicitly held that waiver of redhibitory rights does not violate public policy. *E.g., California Chem. Co. v. Lovett,* 204 So.2d 633, 636 (La.App.1967) ("it has been held not to be contrary to public policy for the implied warranty to be excluded by the contract"); *Von Zonneveld Bros. v. Cary,* 86 So.2d 252, 254 (La.App. 1956) (same).[29] Furthermore, DI has failed to show that Kansas law would so oppress or disadvantage DI that a Louisiana court would refuse to apply it. Kansas has adopted, with slight modification, the Uniform Commercial Code.[30] Thus its law on warranties and waiver of warranties, contained primarily in Kan.Stat.Ann. §§ 84–2–312 to –318 (1965), *as amended by* 1981 Kan.Sess.Laws ch. 215, § 2,[31] is virtually identical to the law in forty-eight other states.[32] We conclude that Louisiana courts would find that Kansas law is not oppressive, unfair, "contrary to equity or good morals," or "repugnant to" Louisiana law or public policy. *Smith v. Globe Indem. Co.,* 243 So.2d 882, 889 (La.App.1971).[33] We, therefore, hold that the choice of law provision is valid, and that Kansas law governs the sale of the airplane.

## VI

In its amended complaint, DI says that it "is entitled to all of the rights and remedies afforded by the laws of the State of Kansas in existance [*sic*] at the time the [contract] was entered into insofar as" the allegations in its amended complaint would allow. Having determined that Kansas law governs the sale of the airplane, we now apply that law and dispose of parts of this case. We do so because additional proceedings on these parts in the district court are unnecessary, and because ending the litigation on them would further judicial economy and efficiency. *Chamberlain v. Kurtz,* 589 F.2d 827, 840 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Blaney v. Florida Nat'l Bank,* 357 F.2d 27, 28 (5th Cir. 1966).

■ We note at the outset two preliminary points. First, the Kansas Consumer Protection Act, Kan.Stat.Ann. §§ 50–623 to –644 (1976 & Supp.1980), does not apply to this sale. DI is a corporation, not an "individual," and thus does not qualify as a "consumer" under the Act. *See id.* § 50–624(b), (f), Kansas comments b, j.[34] Hence we apply the Uniform Commercial Code, as adopted in Kansas, to the sale.

Second, HB argues that DI's sale of the airplane back to HB constitutes, under Louisiana law, a compromise of DI's claim, which bars DI from bringing suit. The district court, however, rejected this argument, and found that the parties did not

---

**29.** *See, e.g., Prince v. Paretti Pontiac Co.,* 281 So.2d 112, 117 (La.1973) ("the buyer may waive the implied warranty against hidden defects"); *cf. Gulf States Utils. Co. v. Ecodyne Corp.,* 635 F.2d 517, 521 n.5 (5th Cir. 1981) (warranty of workmanship for building); *Louisiana Nat'l Leasing Corp. v. ADF Serv.,* 377 So.2d 92, 95 (La.1979) (lessor's guarantee against vices and defects); *Slack v. Inglehart,* 386 So.2d 967, 970 (La.App. 1980) (sale of commercial building).

**30.** 1 U.L.A. 1 (Supp.1981).

**31.** The Kansas Consumer Protection Act, which we conclude does not apply to this sale, *see* p. 1060 *infra*, also deals with these subjects.

**32.** *See* 1 U.L.A. 1 (Supp.1981).

**33.** *See* R. Leflar, American Conflicts Law § 48, at 91–92 (3d ed. 1977) ("It is a rare case in which a claim validly existing under the laws of one American state can be said to be so far outside the pale of social, economic, and moral standards currently imposed by our civilization as to be violative of the strong public policy of any sister state.").

**34.** *Accord, Toledo Metro Fed. Credit Union v. Ted Papenhagen Oldsmobile, Inc.,* 56 Ohio App.2d 218, 221, 381 N.E.2d 1337, 1339 (Lucas County Ct. 1978); *Nelson v. United States Fire Ins. Co.,* 259 Cal.App.2d 248, 252, 66 Cal.Rptr. 115, 118 (1968); *Georgetown College, Inc. v. Webb,* 313 Ky. 25, 27, 230 S.W.2d 84, 86 (1950); Uniform Consumer Sales Practices Act § 2 commissioners' comments, 7A U.L.A. 5 (1978). (The Kansas Act "is a substantial adoption of the Uniform Act." 7A U.L.A. at 2.) The wording of other Kansas statutes also supports this conclusion. *See* Kan.Stat.Ann. §§ 16a–1–301(10), (29), 79–3220(a), (c), –32,109(b), –32,-110(b)–(c) (Supp.1980); *id.* § 79–3301(b)–(c) (1977).

intend that the sale effect a compromise of DI's claims.

 The common law doctrine of accord and satisfaction embraces the Louisiana doctrine of compromise. *See Barnes v. Mid-Continent Cas. Co.*, 192 Kan. 401, 402, 388 P.2d 642, 644 (1964); *Pipes v. Jesse F. Heard & Sons*, 258 So.2d 187, 190 (La.App. 1972); Litvinoff, *Contracts in Particular, The Work of the Louisiana Appellate Courts for the 1974–1975 Term*, 36 La.L. Rev. 417, 433–34 (1976). The party asserting the defense of accord and satisfaction bears the burden of proof. *Sanders v. Birmingham*, 214 Kan. 769, 775, 522 P.2d 959, 965 (1974). Reading the record in the light of Kansas law, we conclude that the evidence supports the district court's finding.

We now turn to DI's warranty claims. Kan.Stat.Ann. § 84–2–316(2) provides:

> to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

Kan.Stat.Ann. § 84–1–201(10) defines "conspicuous" as follows:

> A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON–NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous." Whether a term or clause is "conspicuous" or not is for decision by the court.

Despite the lack of Kansas case law definitively interpreting these two sections, *J&W Equip., Inc. v. Weingartner*, 5 Kan.App.2d 466, 468, 618 P.2d 862, 865 (1980), Kansas courts have discussed them sufficiently to enable us to hold that DI validly waived all warranties except express, written warranties.

 This issue turns on whether the waiver of the implied warranties of merchantability and fitness was sufficiently conspicuous, which is a question of law. *See George C. Christopher & Son v. Kansas Paint & Color Co.*, 215 Kan. 185, 194, 523 P.2d 709, 718, *adhered to as modified*, 215 Kan. 510, 511, 525 P.2d 626, 627 (1974); *J&W Equip., Inc. v. Weingartner*, 5 Kan. App.2d at 467, 618 P.2d at 864. Thus, since the contract with the disputed waivers is in the record, our review is de novo in nature because we have "the same opportunity to consider the evidence and determine the question of law as to whether or not the disclaimer as contained in the contract [i]s conspicuous." *Id.* In reviewing the contract, we must look at all of its provisions, as a whole, to determine whether adequate attention was drawn to the waiver. *Id.* at 468, 618 P.2d at 864.

 We conclude that the contract meets this test. The disputed waiver is in the April 6 agreement,[35] which we described above, p. 1054 *supra*. The waiver is in boldface, uppercase type. It stands out among the words around it. It is on the same side of the contract as the signatures, including Delhomme's signature. It contains the word "merchantability." It is on the contract itself, and not, for example, on a post-contract document like an invoice. And the contract contains a prominent warning to read the contract before signing it. This waiver is, therefore, conspicuous under Kansas law. *Atlas Indus. v. National Cash Register Co.*, 216 Kan. 213, 221, 531

---

**35.** The March 30 agreement also contains a waiver provision, which provides: "To the extent allowed by applicable law and effective immediately following the end of the 180 day period set forth above in [the "Manufacturer's Limited Warranty"], Buyer waives as to Seller and Manufacturer all other warranties, whether of merchantability, fitness or otherwise." This waiver, which was in effect subsumed by the waiver in the April 6 contract, is not at issue in this appeal.

P.2d 41, 48 (1975); *George C. Christopher & Son v. Kansas Paint & Color Co.*, 215 Kan. at 192, 194, 523 P.2d at 716, 718; *J&W Equip., Inc. v. Weingartner*, 5 Kan.App.2d at 467–71, 618 P.2d at 863–66.

■ Furthermore, the "squawk-free" warranty does nothing to vitiate the waiver. Even if, as the trial court apparently concluded, under Louisiana law the "squawk-free" warranty suggests that DI did not intend to waive implied warranties, it has no such effect under Kansas law. Under Kansas law, an implied warranty may be coextensive with an express warranty. *See Atlas Indus. v. National Cash Register Co.*, 216 Kan. at 221, 531 P.2d at 48. The existence of such an express warranty, however, does not suggest that the parties intended to negate a provision elsewhere in the contract waiving all implied warranties. Rather, it suggests that they intended that all rights under the contract, even rights that might otherwise be granted by implied warranties, be grounded on the express warranties. Thus we disagree with DI's contention that "[t]he waiver language is ambiguous . . . because it purports to take away from buyer that which he specifically bargained for."

■ DI's only valid ground for complaint, therefore, is HB's alleged failure to comply with the express "squawk-free" warranty. The contract provides that the manufacturer's limited remedy "shall be the exclusive remed[y] for any breach of warranty" under the contract. Thus the contract limits DI's remedy for breach of the "squawk-free" warranty to repair or replacement of the parts that made the airplane violate that warranty.

■ This limitation is valid under Kansas law. It satisfies the requirements of Kan.Stat.Ann. § 84–2–719(1) (1965),[36] and is not unconscionable under § 84–2–719(3).[37] As stated by the court in *Kansas City Structural Steel Co. v. L. G. Barcus & Sons*, 217 Kan. 88, 535 P.2d 419 (1975):

> The policy of the law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practiced. Contracts freely arrived at and fairly made are favorites of the law. None of the parties here involved were neophytes or babes in the brambles of the business world. Both companies, it would appear, dealt in projects involving considerable sums of money; both operated substantial business enterprises; and there is no suggestion that their businesses were not capably managed and profitably operated.

*Id.* at 95, 535 P.2d at 424 (citation omitted); *see* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code §§ 12–11 to –12 (2d ed. 1980).

■ However, one other issue remains: the possibility that the manufacturer's limited remedy "faile[d] of its essential purpose" under Kan.Stat.Ann. § 84–2–719(2). If it did, then DI would not be limited to the manufacturer's limited remedy, but could instead go beyond it and recover damages. *Id.* official UCC comment 1; J. White & R. Summers, *supra*, § 12–10.

■ Although the trial court found that the airplane contained redhibitory vices, we cannot necessarily equate that with a finding that the manufacturer's lim-

---

**36.** Kan.Stat.Ann. § 84–2–719(1) provides in pertinent part:

> Subject to the provisions of subsections (2) and (3) of this section . . .
>
> (a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

> (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

**37.** Kan.Stat.Ann. § 84–2–719(3) provides:

> Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

ited remedy failed of its essential purpose. The basic test in a redhibitory action is what the buyer would have done if, at the time of sale, he had known of the product's hidden vices or defects. *E.g., Perrin v. Read Imports, Inc.*, 359 So.2d 738, 740 (La. App.1978). The test in determining whether a limited warranty failed of its essential purpose is whether the buyer is given, within a reasonable time, goods that conform to the contract. *Beal v. General Motors Corp.*, 354 F.Supp. 423, 426 (D.Del.1973); *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 418, 265 N.W.2d 513, 520 (1978); *see Ehlers v. Chrysler Motor Corp.*, 88 S.D. 612, 619, 226 N.W.2d 157, 161 (1975).[38] Circumstances that support a redhibitory action, therefore, might not support an action under § 84–2–719(2). *Compare Prince v. Paretti Pontiac Co.*, 281 So.2d 112, 114–15 (La.1973) *and Cangelosi v. McInnis Peterson Chevrolet, Inc.*, 373 So.2d 1346, 1349–50 (La.App.1979) *with Koperski v. Husker Dodge, Inc.*, 208 Neb. 29, 34–35, 47–48, 302 N.W.2d 655, 658 59, 665–66 (1981) *and Lankford v. Rogers Ford Sales*, 478 S.W.2d 248, 249, 251 (Tex. Civ.App.1972). Moreover, the damages available in a redhibitory action may differ from those available under § 84–2–719(2). *Compare Stratton-Baldwin Co. v. Brown*, 343 So.2d 292, 297–98 (La.App.1977) *and Breaux v. Winnebago Indus.*, 282 So.2d 763, 770 (La.App.1973) *with Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71, 78 (Minn.1981) *and Murray v. Holiday Rambler, Inc.*, 83 Wis.2d at 521, 265 N.W.2d at 521 (1978).

▪ Unlike the question whether DI has a § 84–2–719(3) unconscionability claim, which is a question of law, the question whether the circumstances in this case justify a § 84–2–719(2) action by DI against either HB or Beech Aircraft Corporation is

a question of fact. *Johnson v. John Deere Co.*, 306 N.W.2d 231, 237–38 (S.D.1981). We, therefore, remand this case to the district court to determine whether DI has a cause of action under § 84–2–719(2), and, if so, to assess the damages due.

REVERSED IN PART AND REMANDED.

**38.** One court also set forth these general considerations:

In determining whether the contract limitation fails of its essential purpose, the facts and circumstances surrounding the contract, the nature of the basic obligations of the party, the nature of the goods involved, the uniqueness or experimental nature of the items, the general availability of the items, and the good faith and reasonableness of the provision are factors which should be considered.

*J. A. Jones Constr. Co. v. City of Dover*, 372 A.2d 540, 549 (Del.Super.), *appeal dismissed*, 377 A.2d 1 (Del.1977).

