663 So.2d 204 (1995)
CONTINENTAL EAGLE CORPORATION, Plaintiff-Appellant,
v.
TANNER & CO. GINNING, et al., Defendant-Appellee.
No. 95-295.
Court of Appeal of Louisiana, Third Circuit.
October 4, 1995.
*205 Marshall Travis Napper, Monroe, for Continental Eagle Corp.
Josiah William Seibert III, Vidalia, for Tanner & Co. Ginning, et al.
Before DOUCET, C.J., and YELVERTON and PETERS, JJ.
DOUCET, Chief Judge.
This case concerns interpretation of a contract.
In 1990 Continental Eagle Corporation (CEC), a Delaware Corporation, owned a cotton gin known as Harvest Gin. The gin was located in Roscoe, TX. In late September or October of 1990, CEC approached George "Buddy" Tanner, of Tanner & Company, in the hope of selling the gin to Tanner & Company. In November 1990, Tanner and his wife went to look at the gin accompanied by Billy R. Bratton, part owner of a gin supply company. Paul Wilson of CEC and another employee of CEC were present when the Tanners inspected the gin. After inspecting the gin, the Tanners made an offer that Wilson rejected on behalf of CEC.
After further negotiations, Tanner & Company entered two purchase agreements with CEC. The first agreement provided that the Tanners would purchase the gin from CEC for $483,000. The agreement did not mention sales tax. The agreement further provided that it was to be "construed and governed by the laws of the State of Alabama." The second agreement provided for the purchase of a suction system and feed control system for the gin for a price of $92,000. The contract provided that sales tax on the purchase was to be added to the stated price. However, language was added to the contract to indicate that payment in full was received with the order.
In January 1991, the Tanners removed the gin to Frogmore, Louisiana. Also in January, CEC presented the Tanners or Tanner & Company with a demand for payment of Texas sales tax of $35,017.50 on the purchase of the gin. The Tanners refused to pay. CEC brought this suit naming as defendants Tanner & Company Ginning Corporation, Tanner & Company and George Tanner.
After a trial on the merits, the trial judge rendered judgment in favor of the defendants and rejecting CEC's claims. In his reasons for judgment, the trial judge said that the agreement was "ambiguous and uncertain as to whether the $483,000,00 [sic] amount included all applicable sales taxes." Applying La.Civ.Code art. 2053, he found that the ambiguity was to be resolved in favor of the defendants. CEC appeals.

APPLICABLE LAW
CEC argues that since payment of Texas sales tax is involved, Texas law should be applied. We do not agree. The issue before us is not whether the tax must be paid. Texas law apparently requires payment of sales tax on the transaction. The question before us is whether the purchase *206 price stated in the sales agreement included sales tax or whether the purchasers were to pay sales tax in addition to the price stated in the sales agreement. This is a question of contract interpretation.
"It is well established that where the parties stipulate the state law governing the contract, Louisiana conflict of laws principles require that the stipulation be given effect, unless there is statutory or jurisprudential law to the contrary or strong public policy considerations justifying the refusal to honor the contract as written. American Standard Leasing v. Plant Specialties, 427 So.2d 555 (La.App. 3 Cir.1983); Associated Press v. Toledo Investments, Inc., 389 So.2d 752 (La.App. 3 Cir.1980). A choice of law provision in a contract is presumed valid until it is proved invalid. The party seeking to prove such a provision is invalid bears the burden of proof. Delhomme Industries, Inc. v. Houston Beechcraft, 669 F.2d 1049 (5th Cir.1982)."
Whitehurst v. James Noel Flying Services, 509 So.2d 1035, 1037 (La.App. 3 Cir.1987).
Accordingly, we must apply Alabama's substantive law to the interpretation of terms of the contract.

ALABAMA'S CONTRACT LAW
Alabama's commercial code at § 7-1-201 provides, in pertinent part, that:
"(3) `Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including the course of dealing or usage of trade or course of performance as provided in this title (Sections 7-1-103). (Compare `contract.')
* * * * * *
(11) `Contract' means the total legal obligation which results from the parties' agreement as affected by this title and any other applicable rules of law. (Compare `agreement.')"
§ 7-2-202 of the Alabama Commercial code provides that:
"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as the final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
(a) By a course of dealing or usage of trade (Section 7-1-205) or by a course of performance (Section 7-2-208); and
(b) By evidence of consistent additional terms unless the court finds the writing to have been intended as a complete and exclusive statement of the terms of the agreement."
In Hooper v. Britt, 35 Ala.App. 612, 51 So.2d 547, 550 (1951), the court of appeals stated that:
"The intent of the parties should be gleaned from a consideration of the whole instrument. The subject matter, the situation and relationship of the grantor and grantee, the course of dealings between them, the object and purpose of the conveyance, together with all the circumstances surrounding the transaction, should be taken into account." (Citation omitted.)
In Southern Medical Health Systems, Inc. v. Vaughn, ___ So.2d ___ [1995 WL 372055] (Ala.1995), (Docket # 1921524 and 1921557), the Supreme Court of Alabama found that the course of dealing or performance adopted by the parties "throughout their pre-contract and post-contract relationship" was relevant in determining the intent of the parties in contract interpretation cases.
Our reading of Alabama's statutory and jurisprudential law convinces us that evidence of the circumstances surrounding the execution of the agreement to purchase, including the course of dealing between the parties, is admissible to determine the intent of the parties as to sales tax. Paul Wilson testified that sales tax was never mentioned during the negotiations, either by him or the Tanners. George Tanner testified that he told Wilson that he had a total of $575,000 to spend because this was all the bank would loan him. Wilson admitted that the Tanners probably did tell him that they had only *207 $575,000 to spend. Also relevant to the issue of sales tax is the fact that the agreement to purchase the accessory items specifically provided for the buyer to pay sales tax in addition to the price stated in the agreement. Mrs. Tanner testified that she asked that language to the effect that full payment was received at the time of the agreement be added in order to negate that language. Billy Bratton testified that he is in the business of buying and selling new and used cotton gin equipment. His testimony is relevant with regard to the "usage of trade". He testified that sale tax is always mentioned in a contract for the sale of big ticket items and that if the purchaser is to pay sales tax over and above the purchase price, it should be mentioned in the contract. We find it significant that CEC did not offer any testimony as to the "usage of trade" in support of their position.
In light of the evidence regarding the circumstances surrounding the execution of the contract, the course of dealing between the parties, and the evidence of the usage of trade, we find sufficient evidence to support a ruling that the sales tax was included in the purchase price stated in the agreement to purchase the gin. Accordingly, we find no error in the judgment of the trial court dismissing CEC's claim.
The judgment of the trial court is affirmed. Costs of this appeal are assessed to CEC.
AFFIRMED.