**DIXIEBEN COMPANY, Plaintiff,**

**v.**

**Frank B. FALKENBURG and Karle J. Falkenburg, Defendants.**

**No. CV–89–N–0780–S.**

United States District Court,
N.D. Alabama, S.D.

April 19, 1990.

Michael L. Edwards, Jonathan Scott Harbuck, Balch & Bingham, Birmingham, Ala., Judy Y. Barrasso, Stone Pigman Walther Wittman & Hutchison, New Orleans, La., for plaintiff.

William B. Hairston, III, William B. Hairston, Jr., Engel Hairston & Johanson, Birmingham, Ala., for defendants.

## MEMORANDUM OF OPINION

EDWIN L. NELSON, District Judge.

This is a civil action in which the plaintiff seeks compensatory damages under certain agreements allegedly entered into between these parties and others. Jurisdiction is founded upon diversity of citizenship among the parties. 28 U.S.C. § 1332. The action is presently before the court on cross motions for summary judgment. Both motions are now ripe for decision.

### I. THE BACKGROUND OF THE MOTIONS

The principal players are: (1) Benetton S.p.A., an Italian corporation, and Benetton Manufacturing Corporation, a Delaware corporation, each engaged in the business of manufacturing and selling clothing (Benetton); (2) Dixieben Company, a Louisiana corporation contracted to Benetton to locate retailers to operate Benetton clothing stores in the states of Alabama, Mississippi and Louisiana (Dixieben); (3) Al–Ben, Inc., an Alabama corporation which contracted with Dixieben to operate Benetton clothing stores in Birmingham, Huntsville and Tuscaloosa, Alabama (Al–Ben); and (4) the defendants here, Frank and Karle Falkenburg, owners of all the stock of Al–Ben (the Falkenburgs).

On June 1, 1984 Benetton S.p.A and Dixieben entered into a contract through which Dixieben agreed to arrange for retail store operators ("Clients") to sell Benetton products exclusive of the products of other manufacturers. For its services Dixieben was to receive a commission of seven per cent of Benetton's net sales to Dixieben's clients in its three-state area. In that contract Dixieben agreed to guarantee the accounts of its clients.[1] The contract specifically provided that it was to be governed by Italian law. From the fall of 1984 until the summer of 1988 Al–Ben operated several retail Benetton stores in Alabama, but by the middle of 1987 it had fallen far in arrears on payments for merchandise which it had received from Benetton and other "Suppliers."[2] On July 1, 1987, Al–Ben agreed to indemnify Dixieben against any losses it might incur under its agreement with Benetton [the "Al–Ben Indemnification"]. Contemporaneously with that agreement, the Falkenburgs each signed separate agreements by which they guaranteed payment of Al–Ben's obligations to Dixieben arising as a result of the Al–Ben Indemnification, and all other "liabilities" of Al–Ben to Dixieben [the "Falkenburg Guaranties"].[3] The Al–Ben Indemnification, the Falkenburg guaranties and the Falkenburg pledges were all entered into in Alabama but provided that they were to be governed by the law of the state of Louisiana.

Al–Ben's financial difficulties continued, and on February 17, 1988 both Falkenburgs revoked their continuing guaranties, as they were entitled to do. Subsequently, Benetton made written demand upon Dixieben for payment of Al–Ben's debts and Dixieben, in turn, made demand upon the Falkenburgs.

## II. The Applicable Law

Generally, a federal court sitting in a diversity case must apply the law of the state in which it is located. *Klaxon Co. v. Stentor Electrical Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, when a case was filed in a district court in which venue was proper, and the defendants seek and obtain a transfer to a district court in another state under 28 U.S.C. § 1404(a), the change in venue is but a "change in courtrooms, and not a change in applicable law". *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 820, 11 L.Ed.2d 945, 962–63 (1964). The Supreme Court has rejected the notion that parties may "get a change of law as a bonus for a change of venue". *Id.* This action was initially filed in the United States District Court for the Eastern District of Louisiana and was transferred to this court pursuant to 28 U.S.C. § 1404(a) on motion of the defendants for the "convenience" of the parties and witnesses. This court, therefore, is duty bound to apply the law that would have been applied by the district court for the Eastern District of Louisiana had the case remained there.

Louisiana law provides that the parties may agree to apply the law of any jurisdiction to their contracts so long as the public

---

**1.** The role of Benetton Manufacturing Corporation in this scenario is more than a little obscure. It was not a party to the contract between Benetton S.p.A. and Dixieben. Clearly, Benetton S.p.A. and Benetton Manufacturing Corporation are separate and distinct legal entities. By affidavit Aldo Palmeri has described himself as "Managing Director" of Benetton S.p.A., "a corporation organized under the laws of Italy." In another affidavit, Antonio Piva states that he is "President of Benetton Manufacturing Corporation." He also states Benetton Manufacturing is a Delaware corporation having its principal place of business in Rocky Mount, North Carolina. A substantial portion of the debt claimed by Dixieben is based upon obligations allegedly incurred by Al–Ben for the purchase of merchandise from Benetton Manu-

facturing Corporation. There is nothing in the record to support any claim that Dixieben's guarantee under the contract of June 1, 1984 runs to anyone but Benetton S.p.A.

**2.** See Exhibit 16 to the deposition of Gilberto Casagrande. These other "Suppliers" apparently were approved by Benetton.

**3.** The Falkenburgs also pledged their stock in Al–Ben to secure their guaranties of that date. In its complaint, Dixieben sought ownership of that stock. However, in its motion the plaintiff has not argued for this relief. Instead, it has sought an award of money damages. That may be for the reason that Al–Ben is presently in involuntary bankruptcy.

policy of the State of Louisiana is not offended. *Lirette v. Union Texas Petroleum Corp.*, 467 So.2d 29, 32 (La.App. 1st Cir.1985). Furthermore, one who seeks to invalidate an agreement that a contract will be governed under the law of a particular state bears the burden of proving a violation of Louisiana public policy. The courts of that state are reluctant to void such provisions as against public policy. *Delhomme Industries, Inc. v. Houston Beechcraft, Inc.*, 669 F.2d 1049 (5th Cir.1982). "They will do so only if there is 'an express legislative or constitutional prohibition or a clear showing that the purpose of the contract contravenes good morals or public interest'". *Id.* [citations omitted]. There is no suggestion here that the law selection provisions of any of the contracts violate Louisiana public policy as evidenced by an express legislative or constitutional provision. Also there is nothing to suggest that any of the contracts or any provision of them is against good morals or the public interest. The court must therefore enforce the contract clauses which specify the laws of either Louisiana or Italy as controlling. Accordingly, the court finds that the Dixieben/Benetton contract is governed by Italian law and the Al–Ben indemnification and the Falkenburg guaranties are governed by the law of Louisiana.

## III. The Motions for Summary Judgment

### A. The Evidentiary Materials

It is undisputed that in June 1984 Benetton S.p.A. and Dixieben entered into a contract by which Dixieben undertook to secure store operators in Alabama who would sell at retail a line of clothing manufactured by Benetton. In return for its service Dixieben was to receive a commission of seven per cent on goods purchased by its "Clients." Dixieben agreed that it would be responsible for the accounts of its clients.[4] Among the "Clients" secured by Dixieben was Al–Ben, an Alabama corporation which operated Benetton stores in Huntsville, Birmingham, and Tuscaloosa, Alabama. On July 31, 1987, after Al–Ben had been unable to pay for merchandise sold and delivered by Benetton, Al–Ben, in consideration for Dixieben securing additional extensions of credit from Benetton and other "Suppliers," executed and delivered to Dixieben an indemnification agreement which stated in pertinent part:

> [I]n consideration of Dixieben having established credit for Al–Ben with the Suppliers for merchandise *sold and delivered* or *to be sold and delivered in the future* pursuant to the Sales Agreements, and for other good and valuable consideration, the receipt of which is hereby acknowledged, Al–Ben does hereby agree to indemnify and hold harmless Dixieben from and against any loss incurred by Dixieben as a result of its obligations under the Dixieben Guaranties. For purposes of the Agreement, the term "loss" shall include any payment made by Dixieben to Suppliers to satisfy Al–Ben's open account indebtedness with the Suppliers, and shall include, but not be limited to, any loss of Dixieben's property, damages, costs, expenses, courts costs, attorneys' fees and compensation of any kind or nature whatsoever, including costs and attorneys' fees *incurred in the enforcement of this Agreement,* arising out of Dixieben's obligations under the Dixieben Guaranties. (Emphasis supplied.)

> Al–Ben further agrees that, *immediately upon demand by any one or more* of the Suppliers upon Dixieben to pay the open account indebtedness of Al–Ben, Al–Ben shall pay Dixieben the amount of said open account indebtedness. *Immediately upon receiving said payment[s]* from Al–Ben, Dixieben shall remit the payment[s] directly to the Supplier or Suppliers in question for credit to the Al–Ben account with that Supplier. (Emphasis supplied.)

On the same day that Al–Ben's indemnification agreement was signed the defen-

---

4. Article 9 of the Dixieben/Benetton contract provided:

The Representative [Dixieben] agrees to be responsible for payment of the unpaid amount of an invoice to a Client. Such payments by the Representative will be made by deducting the amount due from future commissions owed to the Representative.

dants each executed and delivered separate but identical agreements in which they guaranteed payment of all Al–Ben obligations to Dixieben. In pertinent part, those guaranties provided:

WHEREAS, the Guarantor, as one of the principal shareholders of the Debtor [Al–Ben], has agreed to guarantee jointly, severally and *in solido* the payment of any of Debtor's obligations to Dixieben now existing or hereafter arising as a result of the Indemnification Agreement [the Al–Ben Indemnification], and to guarantee jointly, severally and *in solido* all other Liabilities (as hereinafter defined) of the Debtor to Dixieben in such amounts and such manner as is more set forth hereinafter.

NOW THEREFORE, in consideration of Dixieben having established credit for Debtor with the Suppliers for *merchandise sold and delivered or to be sold and delivered in the future by the Suppliers to Debtor* [Al–Ben], and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantor, jointly, severally and *in solido*, unconditionally hereby guarantees the due and punctual payment to Dixieben when and as the same shall become due and payable (whether by acceleration or otherwise) of the following (collectively, the "Liabilities"): all indebtedness, obligations and liabilities of the Debtor to Dixieben of every kind, character and description whatsoever, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred, contracted or arising, joint, several, or *in solido*, liquidated or unliquidated, regardless of how they arise or by what agreement or instrument they may be evidenced or whether they are evidenced by any agreement or instrument, and whether incurred as maker, drawer, endorser, surety, guarantor, indemnitor or other-

wise, together with all interest, insurance premiums, attorney's fees, and other charges of whatever kind and nature.

\* \* \* \* \* \*

The Guarantor further jointly, severally and *in solido* agrees that this agreement shall remain in full force and effect until revoked or terminated by a written instrument, signed by the Guarantor and delivered to Dixieben and acknowledged in writing by Dixieben, and even after such revocation or termination, shall be and remain effective as to any Liabilities then outstanding ... (Emphasis supplied.)

Al–Ben's financial difficulties continued and, on February 17, 1988 the Falkenburgs each revoked their guaranties.[5] Benetton S.p.A. and Benetton Manufacturing continued to ship merchandise to Al–Ben until April, 1988.

On December 6, 1988 Benetton made a written demand upon Dixieben for payment of Al–Ben's open account indebtedness and Dixieben, in turn, made written demands on the Falkenburgs for performance under their guaranties. The amounts claimed were $1,044,656.80 for Benetton S.p.A. and $118,397.94 for Benetton Manufacturing Corporation. As of the dates these motions were filed, neither Al–Ben nor the Falkenburgs have paid Benetton or Dixieben and neither has Dixieben paid Benetton any of the amounts allegedly owed by Al–Ben.

■ One who purchases merchandise on credit incurs a legal debt constituting an open account. *L. Frank & Co. v. Devilliers Foodliner, Inc.*, 365 So.2d 501 (La.App. 4th Cir.1978). In Louisiana, business records, such as invoices, are competent evidence as to the amount owed on an account, when the bookkeeper or supervisor of the records testifies as to the correctness of them. *L. Frank & Co. v. Devilliers Foodliner, Inc., supra.* Dixieben

---

**5.** Except for the signatories, the revocation instruments were identical. They were:

Effective this day, I revoke my Guaranty of the obligations of Al–Ben, Inc. to you as evidenced by a Continuing Guaranty Agreement dated on or about July 30, 1987 or by any other document, agreement or operation of law.

They were sent by U.S. Postal Service Express Mail and received and signed for by an agent of Dixieben.

has submitted properly authenticated business records showing that Al–Ben purchased merchandise on credit from Benetton, and that Al–Ben has incurred an open account indebtedness to Benetton S.p.A. in the amount of $1,044,656.80 plus interest and to Benetton Manufacturing in the amount of $118,397.94 plus interest. The affidavit of Aldo Palmeri and accompanying records proves the Al–Ben open account indebtedness to Benetton S.p.A. and the affidavit of Antonio Piva and accompanying records proves the Al–Ben open account indebtedness to Benetton Manufacturing.[6] Thus, it is established that Al–Ben is indebted on open accounts to Benetton S.p.A. and Benetton Manufacturing Corporation.

It is clear then that, subject to setoffs or defenses that may be available to it, Al–Ben is indebted to Benetton S.p.A. and Benetton Manufacturing Corporation on two separate open accounts. Subject to any defenses it may have, Al–Ben will be liable to Dixieben, under its indemnity agreement of July 31, 1987, for those accounts if Dixieben is liable to Benetton S.p.A. and Benetton Manufacturing Corporation under its contract of June 1, 1984. Furthermore, under the law of Louisiana, Dixieben, as guarantor of Al–Ben's open account indebtedness to Benetton, is entitled to recover any amounts from Al–Ben which it is obligated to pay Benetton on those open accounts. *See, Fidelity & Deposit Company v. Cloy Const. Co.,* 425 So.2d 887 (La.App. 1st Cir.1983) (Surety on construction contract allowed to recover payments expended as surety.) Louisiana law treats guarantors and sureties identically. *W.H. Ward Lumber Co. v. Merit Homes, Inc.,* 522 So.2d 648 (La.App. 5th Cir.1988). Finally, again subject to any defenses they may have, the Falkenburgs will be liable, under their guaranties of July 31, 1987, to Dixieben for any amounts for which Al–Ben is liable either under its indemnification agreement or any "other Liabilities" of Al–Ben to Dixieben.

**B. DIXIEBEN'S LIABILITY TO BENETTON S.P.A.**

As stated above, the contract between Benetton S.p.A. and Dixieben is to be governed by the law of Italy. The pertinent part of the Dixieben–Benetton contract provided:

> The Representative [Dixieben] agrees to be responsible for payment of the unpaid amount of an invoice to a Client. Such payments by the Representative will be made by deducting the amount due from future commissions owed to the Representative.

The defendants maintain that Dixieben's agreement with Benetton S.p.A. to pay its client's unpaid invoices from future commissions represented the exclusive means by which Benetton was to be paid and, since Dixieben is no longer representing Benetton and no future commissions will ever be earned, Dixieben cannot be held liable to Benetton. The essence of the argument is, if no future commissions are earned, no debt is owed.

It is for the court to determine the Italian law applicable to this contract language.[7] Furthermore, such questions may be resolved on motion for summary judgment. *Bassis v. Universal Line, S.A.,* 436 F.2d 64 (2nd Cir.1970), *Kashfi v. Phibro–Salomon, Inc.,* 628 F.Supp. 727 (S.D.N.Y.1986). Though expert testimony may not be invariably necessary, the court may resort to such testimony to aid it in the determination of foreign law. *Curtis v. Beatrice Foods Co.,* 481 F.Supp. 1275 (S.D.N.Y.1980).

The plaintiff and the defendants have secured and provided the court with opinions of Italian lawyers regarding the proper interpretation of that clause of the

---

6. The court has referred to these documents as "affidavits" though they are in fact "declarations" filed pursuant to 28 U.S.C. § 1746. For present purposes the distinction is not significant.

7. Rule 44.1, Fed.R.Civ.P. provides, "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The Court's determination shall be treated as a ruling on a question of law."

Benetton–Dixieben contract under which Dixieben is claimed to have guaranteed the open account of Al–Ben. Guido Piccione, an Italian lawyer, provided an opinion on behalf of Dixieben, and Giovanni Peluso, an Italian lawyer now studying at the McGeorge School of Law in Sacramento, California, provided an opinion on behalf of the Falkenburgs. Both Peluso and Piccione agree the clause is to be interpreted according to articles 1362–1371 of the Italian Civil Code. Mr. Peluso also states that Articles 1341 and 1342 are applicable. Briefly stated, pertinent provisions of Italian law provide:

1. Article 1362. The court should look to the common intentions of the parties without restricting itself to the literal meanings of the words used. The court may look to the conduct of the parties, including their conduct subsequent to the execution of the agreement.

2. Article 1363. The contract is to be considered as a whole and each clause must be "attributed the sense that results from the entire agreement."

3. Article 1366. "The contract must be interpreted in good faith."

4. Article 1367. Ambiguous clauses in a contract must be "interpreted in the manner which gives them some effect, rather than by resorting to an interpretation in which the clauses would have no effect."

5. Article 1368. Such ambiguous clauses are to interpreted giving effect to local customs and practices.

6. Article 1369. Expressions with more than a single meaning should be given a meaning consistent with nature and purpose of the entire contract.

7. Article 1370. Ambiguous contract clauses which are part of the "general conditions of contract" or part of forms should be interpreted against the party who produced such clauses.

8. Article 1341. General conditions in a contract are binding on the party not producing them if that party, at the time of contracting, had notice or by due diligence should have known of them. Certain provisions, those tending to favor the party producing the language, are binding only if they are specifically approved in writing by the nonproducing party.

9. Article 1342. Clauses which are parts of forms are given a subservient position in relation to contract clauses which are specifically negotiated between the parties.

From these sections of the Italian Civil Code, with the aid of both Italian lawyers, the court extracts the following principles to determine the liability of Dixieben for the unpaid debts of Al–Ben. The entire contract, including the contested clause, is to be interpreted to give effect to the common intentions of the parties, applying the *"bona fide principle"* of Article 1366. The *bona fide principle* requires that the circumstances upon which the parties reasonably relied must be considered in interpreting the provision in question. The literal language of the agreement, and its normal, common sense meaning, is considered to be something upon which parties may reasonably rely. The literal meaning of the words control only when "such an interpretation is sufficient to ascertain the common will of the parties". (Affidavit of Giovanni Peluso). When in doubt, the whole contract and the individual clauses should be interpreted in such a way as to be effective, and not meaningless. Article 1367, Italian Civil Code. Commercial customs and usage generally adopted in the place where the contract is made may be used to aid interpretation in cases of doubt. Article 1368, Italian Civil Code. Clauses in a standard form or adhesion contract which the drafter relies upon to claim non-performance must be interpreted in their literal sense and any questions must be resolved in favor of the offeree. Article 1370, Italian Civil Code. A contract is an adhesion contract under Italian law if it is created in a pre-printed standard form, or with general conditions of sale or with other clauses which must be specifically enumerated and accepted by the offeree by specific and clear acknowledgment, by signature after the signing of the contract itself. In an adhesion contract an offeree has no power to modify or negotiate those

clauses, but may only "take them or leave them". (Affidavit of Giovanni Peluso). If the contract is one of adhesion under Italian law and the indemnity clause is ambiguous, the clause must be construed in favor of Dixieben.

The court concludes that an Italian court would treat the contract between Dixieben and Benetton as one of adhesion. Benetton's offer specifically required Dixieben to accept in writing certain specified clauses contained in the offer which favored Benetton.[8] This factor is important, however, only if the clause in question is ambiguous. After considering the contract under the principles of Italian law articulated above, the court has concluded that the indemnification clause is in no way ambiguous. The court is not bound by the literal language but must effect the intentions of the parties. The contract as a whole, clearly shows the parties intended to establish a profitable business relationship. Benetton insisted on clear and unequivocal language to assure itself that it would be paid for the merchandise it sold to Dixieben's clients, "The Representative agrees to be responsible for payment of the unpaid amount of an invoice to a Client." After clearly making Dixieben liable for payments of its clients' debt, Benetton then provided a convenient means to collect on those obligations from Dixieben. Any other interpretation of the payment clause would render meaningless Dixieben's agreement to indemnify Benetton against losses from shipments to Dixieben's clients in Alabama, Mississippi and Louisiana. To interpret the clause as the defendants suggest would provide an expedient means by which Dixieben could have relieved itself of substantial financial obligations. It could have simply terminated the contract as it was entitled to do under Article 11. Such an interpretation would not give effect to the indemnification clause or the intent of the

parties when they entered into the contract.

### C. DIXIEBEN'S LIABILITY TO BENETTON MANUFACTURING CORPORATION

■ The contract of June 1, 1984 specifies that it is between "Benetton S.p.A., with head-office in Ponzano Veneto, Via Chiess Ponzano, 24, at the Court of Treviso with the number 12470, fiscal code number 01147660268." and "Dixieben Co.—c/o Jones, Walker—225 Baronne (21st floor—New Orleans, LA 70112 (U.S.A.)." The affidavit of Antonio Piva states that he is president of Benetton Manufacturing Corporation, a Delaware corporation. The Benetton/Dixieben contract affirmatively shows that Dixieben's indemnification runs to Benetton S.p.A. and to no other. For that reason Dixieben has no legal obligation to indemnify Benetton Manufacturing Corporation against loss on its open account with Al–Ben. It follows that if Dixieben is not liable to Benetton Manufacturing Corporation, Al–Ben cannot be liable to Dixieben and, if Al–Ben is not liable to Dixieben, the Falkenburgs cannot be liable on their guaranties to Dixieben for the Benetton Manufacturing Corporation open account.

### D. IS DIXIEBEN'S CLAIM RIPE?

■ The defendants argue that Dixieben has suffered no loss because it has not yet been required to pay Benetton for any of Al–Ben's unpaid invoices and, because it has suffered no loss, as defined by the Al–Ben agreement to indemnify Dixieben, it has no claim against the Falkenburgs on their guaranties. The Al–Ben indemnity agreement defines "loss" as

> any payment made by Dixieben to the Suppliers to satisfy Al–Ben's open account indebtedness with the Suppliers, and shall include, but not be limited to,

---

**8.** The closing paragraph in Benetton's offer contained the following language:

> We kindly ask you to confirm us your acceptance of this contract, transcribing it in full on your letter-head and stating, as provided by Articles 1341 and 1342 Italian Civil Code, that you specifically accept the Articles: 2, 3, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, of this contract.

In replying to the request, Dixieben, in a separate section separately signed by its president, included the following:

> In accordance with Articles 1341 and 1342 Italian Civil code, we specifically approve Articles 2, 3, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15 of the present contract.

any loss of Dixieben's property, damages, costs, expenses, court costs, attorneys' fees and compensation of any kind or nature whatsoever, including costs and attorneys' fees incurred in the enforcement of this Agreement ...

Under the literal language of this clause Dixieben has suffered no loss. It has made no "payment" to any supplier. There is no basis in the record for finding that it has lost any property or suffered any damage. There being no loss, there appears to be nothing against which Al–Ben is required to indemnify Dixieben.

The defendants have overlooked an entirely separate basis for liability on the part of Al–Ben and consequently, themselves. Under the law of Louisiana, Dixieben guaranteed the open accounts of Al–Ben and is entitled to recover any payments it has made which were occasioned by its guarantee. See, Fidelity & Deposit Company of Maryland v. Cloy, et al., supra. The existence and terms of the Al–Ben indemnification agreement are irrelevant to the court's consideration of that liability. If Dixieben is subrogated to the debt of Benetton as to the open account of Al–Ben, it is entitled to recover from Al–Ben. This would be one of the "other Liabilities" of Al–Ben which the Falkenburgs guaranteed.

Prior to January 1, 1988 Louisiana law provided in clear and unequivocal terms that the surety was allowed to sue in certain circumstances even before making any payment on the debt of the principal obligor:

A surety may, even before making any payment, bring suit against the debtor to be indemnified by him:

1. When there exists a lawsuit against him for payment.

2. When the debtor has become a bankrupt, or is in a state of insolvency.

3. When the debtor was bound to discharge him within a certain time.

4. When the debt has become due by the expiration of the term for which it was contracted.

5. At the expiration of ten years, when the principal obligation is of a nature to last a longer time; unless the principal obligation, such as that of guardianship, be of a nature not to be extinguished before a determinate time.

Louisiana Civil Code, Article 3057. Under that statute, a surety who sued his principal was entitled to judgment for a sum certain, the amount due the creditor, with a proviso that the amount realized on execution be paid to the creditor. Mudd v. Rogers, 10 La.Ann. 648 (1855). A Louisiana surety's present rights with regard to his principal obligor are governed by provisions of Louisiana's new civil code which became effective on January 1, 1988. Under that code a surety has the rights of subrogation, reimbursement and to require security. Article 3047. He is subrogated to the rights of the creditor after he had paid the principal obligation. Article 3048. He may demand reimbursement from the debtor after he has paid the creditor, provided the debt is "due and exigible." Article 3049. In certain specified circumstances, the surety may demand security for his guaranty before making any payment.

A surety, before making payment, may demand security from the principal obligor to guarantee his reimbursement when:

(1) The surety is sued by the creditor,

(2) The principal obligor is insolvent, unless the principal obligation is such that it performance does not require his solvency;

(3) The principal obligor fails to perform an act promised in return for the suretyship; or

(4) The principal obligation is due or would be due but for an extension of its terms not consented to by the surety.

The principal obligor may refuse to give security if the principal obligation is extinguished or if he has a defense against it.

Louisiana Civil Code, Article 3052. The comments accompanying this section state that the provision was "intended to clarify Louisiana law." The word "security" was substituted in the new statute for "indemnification" in the old because it was thought "a more accurate description of the surety's right." A surety has a cause of action "to require the principal obligor to deposit into the registry of the court funds sufficient to satisfy the surety's obli-

gation to the credit as a pledge for principal obligor's duty to reimburse the surety" when the principal obligor has failed for ten days after demand to provide the required security. Louisiana Civil Code, Article 3054.

It is undisputed that Al–Ben is now in involuntary bankruptcy and has failed to give the required security for ten days following Dixieben's written demand. Thus, under Louisiana law the plaintiff, as surety of Al–Ben's debt to Benetton, has an action to require security from Al–Ben in the amount of the principal debt to Benetton. In the opinion of the court, the Falkenburgs' guaranties were written broadly enough to cover this requirement that Al–Ben give security and that Dixieben may demand of the Falkenburgs security for its guarantee of the debts of Al–Ben.

### E. The Revocation of the Falkenburg Guaranties

█ The defendants assert that because Benetton made no demand for performance upon Dixieben until after they had revoked their guaranties there was no loss to the plaintiff during the lives of the guaranties. However, Louisiana Civil Code, article 3061 provides "... [a] termination does not affect the surety's liability for obligations incurred by the principal obligor, or obligations the creditor is bound to permit the principal obligor to incur at the time the notice is received, nor may it prejudice the creditor or principal obligor who has changed his position in reliance on the suretyship." La.C.C. art. 3061. "A continuing guaranty would be meaningless if it did not continue as security for all indebtedness of the debtor, particularly those obligations arising in the future, until properly terminated or revoked by the surety." *Riverside/Terra Corporation v. K & W Agricultural Services, Inc.*, 540 So.2d 456, 459 (La.App. 1st Cir.1989).

It is clear that at the time the Falkenburg guaranties were executed Dixieben was guarantor for the debts of Al–Ben. It is equally clear that Dixieben was subject to a demand from Benetton whenever any of Al–Ben's invoices were unpaid. The Falkenburg guaranties define "liabilities"

to include "all indebtedness, obligations and liabilities of the Debtor [Al–Ben] to Dixieben of every kind, character and description whatsoever, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred, contracted or arising, joint, several or *in solido,* liquidated or unliquidated, regardless of how they arise or by what agreement or instrument they may be evidenced ..." This definition is broad enough to include those liabilities which existed at the time they were entered and all others incurred before the guaranties were revoked. Al–Ben's liabilities to Dixieben based upon Dixieben's contract with Benetton existed from the moment Al–Ben incurred the debts to Benetton. They did not come into existence when Benetton made demand on Dixieben but were extant before the Falkenburgs revoked their guaranties.

### F. Champerty and Maintenance

█ The defendants assert that Benetton's agreement to pay Dixieben's costs in this suit is champertous. The claim is without merit. The United States Court of Appeals for the Fifth Circuit succinctly outlined the Louisiana law of champerty in *Martin v. Morgan Drive Away, Inc.,* 665 F.2d 598 (5th Cir.1982), *cert. dismissed sub nom. Morgan Drive Away, Inc. v. Samford,* 458 U.S. 1122, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982), as follows:

"Louisiana, being a civil law jurisdiction, does not apply general common law principles of champerty. Instead, an equivalent of the doctrine has been created by statute. La.Civ.Code Ann. art. 2447 prohibits the sale of 'litigious rights' to 'officers of the court,' including attorneys. It has long been settled in Louisiana that this prohibition does not apply to persons who are not 'officers of the court.' *Gilkerson–Sloss Commission Co., v. Bond,* 44 La.Ann. 841, 11 So. 220 (1892) (parties who purchased claim were not officers of the court and restrictions of article 2447 did not apply to them); *cf.* La.Civ.Code Ann. art 2652 ('He against whom a litigious right has been transferred, may get himself released by paying to the transferee the real price of the transfer, together with the interest from its date.')"

*Martin,* 665 F.2d at 605. Consequently, under Louisiana law, the plaintiff and Benetton have not undertaken a champertous agreement.

### G. MUST DIXIEBEN HAVE QUALIFIED TO DO BUSINESS IN ALABAMA?

The defendants argue that Dixieben, a Louisiana corporation, has not qualified to do business in Alabama as it was required to do by Article XII, Section 232 of the Alabama Constitution and, for that reason, is disqualified to pursue these remedies in this court. As noted earlier, the Falkenburg guaranties are governed by Louisiana law and not Alabama law. The defendants have pointed to no provision of the law of Louisiana which would prevent Dixieben from pursuing its remedies here.

### H. UNORDERED OR NON-CONFORMING GOODS

■ Karle Falkenburg has filed two affidavits in which she states that Al–Ben is entitled to credit for merchandise shipped by Benetton which was either not ordered by Al–Ben or did not conform to orders that were placed by Al–Ben. She has presented copies of discrepancy notices which she claims to have sent to Dixieben and to Benetton. Dixieben responds by claiming that notice to Dixieben cannot constitute notice to Benetton, and that the notices were too vague and untimely to satisfy Al–Ben's responsibilities under "the General Conditions of Sale".[9] (Exhibit 1 to the Affidavit of Aldo Palmeri). Aldo Palmeri states that the General Conditions of Sale govern the purchase of Benetton products and are set forth on each purchase order and invoice. Karle Falkenburg denies that she has ever seen the document attached to the Palmeri affidavit entitled "General Conditions of Sale", but states it appears to be "a transcription of certain terms that appear on the bottom of the purchase orders in microscopic print".

Mrs. Falkenburg is the president of Al–Ben and the record shows that she was deeply and personally involved in the operation of its business. Yet she states she has never seen the General Conditions of Sale attached to the affidavits of Aldo Palmeri and Antonio Piva. Exhibit 18 to the deposition of Gilberto Casagrande appears to contain four purchase orders from Al–Ben to Benetton dated October 9, 1985. On the back and across the bottom is a section titled "GENERAL CONDITIONS OF SALE" but which is not the same as is attached to the affidavits of Messrs. Palmeri and Piva.

The defendants rely on Alabama's version of Article Two of the Uniform Commercial Code, without providing a factual or legal basis for determining that the Louisiana court would apply Alabama's Uniform Commercial Code.[10] Dixieben relies on the "General Conditions of Sale" without providing any factual or legal basis for determining that Al–Ben would be bound by these conditions under Louisiana law. Until the parties have clearly and fully presented the factual and legal issues the court has no basis for a ruling on the issue.

### IV. CONCLUSION

Based upon the foregoing the court will enter partial summary judgment in favor

---

9. The General Conditions of Sale provide:

  .  .  .  .  .

 7. **Claims, No Setoff.** Any claims concerning shortfalls in quantity of or damage to the Goods apparent from an external examination of the packages containing the Goods shall be forfeited unless made immediately upon receipt of the Goods by means of a notice written on the carriage or delivery documents and signed by the Purchaser. Any claims for apparent faults in, or damage to the Goods, or shortfalls in quantity of the Goods not apparent from an external examination of the packages, shall be forfeited unless made by registered and recorded delivery letter sent to the Seller within 15 (fifteen) days of receipt of the Goods. The Purchaser shall not be entitled to delay or suspend payment of the Price on the grounds that claims with respect to the Goods are pending or that there has been any alleged breach of warranty. The Purchaser shall have no right to claim the setoff of any sums whatsoever arising out of the warranty contained in § 6 hereof.

  .  .  .  .  .

10. "Louisiana no longer automatically applies the law of the place where a contract is made, *lex loci contractus,* to determine the validity and interpretation of a contract, but instead determines the applicable law by a process known as 'interest analysis.'" *Stickney v. Smith,* 693 F.2d 563 (5th Cir.1982).

of the plaintiff and partial summary judgment in favor of the defendant. Specifically, the court will grant summary judgment for the plaintiff on the issue of the Falkenburgs' liability for Al–Ben's unpaid debts to Benetton S.p.A. incurred prior to the Falkenburgs' revocation of their guaranties. Left open to resolution on further proceedings is the question of the amount of the debt to Benetton S.p.A., those unpaid invoices which may have been issued after the effective date of the Falkenburgs' revocations and the amount, if any, the defendants may be entitled to set off against Al–Ben's debts for unordered or nonconforming merchandise. Upon determination of the amounts due, the Falkenburgs will be required to pay those amounts into court as their pledge to reimburse Dixieben. The court will also grant summary judgment for the defendants as to all claims of Dixieben which are based upon unpaid invoices for merchandise allegedly sold by Benetton Manufacturing Corporation. The motions for summary judgment will in all other respects be denied.

An appropriate judgment will be entered contemporaneously with this memorandum opinion.